Rev. Negil L. McPHERSON, Sr., Individually and on behalf of Angela Marie McPherson, and Negil Livingston McPherson, Jr., minors, et al.

v.

SCHOOL DISTRICT #186, SPRINGFIELD, ILLINOIS, and the Board of Education, School District #186, Springfield, Illinois, et al.

No. S–Civ–74–44.

United States District Court, S. D. Illinois, S. D.

Dec. 7, 1976.

Percy L. Julian, Jr., Daphne Webb, Madison, Wis., Jack Greenberg, James Nabrit, III, Drew Days, III, New York City, for plaintiffs.

Richard R. Grummon, James M. Winning, Springfield, Ill., for defendants.

Julia Quinn Dempsey, Marilyn F. Longwell, Chicago, Ill., for Ill. Office of Education, amici curiae.

N. E. Hutson, Monticello, Ill., for United Schools Association.

ACKERMAN, District Judge.

## SUMMARY

As indicated by the title, the following is a summary of the Court's opinion for purposes of clarification. For specific and detailed information, of course, it will be necessary to refer to the opinion itself.

Springfield is a city of 92,000 population with 19,000 children in its schools. Of these 17.2% are minority children. Most of the minorities are blacks who live in a fairly compact area in the center of the city. The minority children attend elementary schools in their neighborhoods and those schools have predominately black enrollment.

After this desegregation suit was filed, the defendant school board entered into a consent decree in which they admitted that the schools were segregated in violation of the Fourteenth Amendment to the Constitution. Therefore, the school board was required to desegregate the schools and to create a unitary school system by agreed prior order of this Court.

The question now is not whether the schools should be desegregated but rather how best to do it.

The school board and the plaintiffs have each presented plans to accomplish desegregation of the schools. Each has advantages and disadvantages vis-a-vis the other. The decision is not an easy one, for such decision must be squared with the Constitution as interpreted by the United States Supreme Court.

## I.

At the K–3 level the school board has approached the problem from a "neighborhood school" concept. All things being equal, this concept is desirable and preferable, and at first impression this seemed to be the best solution.

First of all, I am convinced that the school board is in perfectly good faith in presenting this part of the plan as well as in their conduct throughout these entire proceedings. That being true, their plan is entitled to great weight. But it is my duty to carefully examine each option and to choose the best one, after considering all factors. So, I approach this task with the principal idea that whatever plan is most fair to all involved must be ordered implemented. After all, this is what the Constitution is all about. If the plan is to work it must not be (or seem to be) less fair to some than to others. This is the underpinning of the opinion.

In keeping the "neighborhood concept" in its K–3 plan the school board has paired or clustered the black schools at the center of the city with the white schools in close proximity to them. This leaves these schools with black populations ranging between 34.6% to 31.7%. The effects of this plan, when charted on a map of the school district, show that clear and dramatic problems would be created. While the schools in and near the center of the city are integrated with each other, the schools on the outer edges of the circle have minority percentages between 2.6% and 10.3%. It is apparent that with the geographic facts of this city, in order to keep the "neighborhood school" concept some schools will be integrated and some will not. That is sure to be perceived by many to be obviously unfair. Though it is a result and not intentional, those schools not included in integration happen to be located generally in the higher socio-economic areas. This too, will seem to many as extremely inequitable. To

order implementation of a plan with this defect, however well intended, places me far too near what Anatol France had in mind in the 19th century when he wrote:

> The law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges, to beg in the streets, and to steal bread.

The plaintiffs' plan divides the district into four quadrants and clusters the schools in each. There is at least one predominately black school in each quadrant. The black school becomes a center where all the children from that quadrant attend for either one or two years, either at the beginning or end of grades 1–6.* During the other school years the students attend their neighborhood schools and the black students are divided among the formerly predominately white schools.

This plan has these advantages: (1) The six schools which are now integrated** (or which can be with minor boundary modifications) are not included in the plan. Thus, where integration is already in effect, it is recognized that no necessity exists to change school patterns. (2) The majority-minority ratio in each school approximates the district-wide population ratio. (3) Two presently predominately black schools are left open whereas defendants' plan closes them. If these schools are closed at this time, the black community is sure to view this as insulting to them. That in turn would adversely affect not only the sensibilities of the minority population, but the workability of the plan as well. If there are valid administrative reasons to close these schools, this can be done in a reasonable time after the schools no longer are considered "black" schools. (4) There is equal participation of all the schools throughout the district. (5) This plan, as distinguished from the defendants' plan, leaves the kindergarten children in their own schools just as they are now.

For these reasons, it seems to me that I have no alternative but to adopt plaintiffs' K–6 plan for implementation.

## II.

Defendants' plan creates two seventh grade centers. Each center draws from half the district and the student ratio is approximately that of the district. This part of the plan clearly meets constitutional standards, is not objected to, and is approved. The plan also provides four eighth and ninth grade centers which are acceptable, not objected to, and are approved.

## III.

The three high schools have the following minority enrollments: Springfield Southeast—27.3%; Lanphier—7.6%; Springfield—10.5%. Defendants assert that this is within permissible range and that changing housing patterns will naturally correct the imbalance. They propose to carefully monitor the ratio and make future changes as necessary. Plaintiffs wish boundary changes to bring the ranges in each school closer. Although it seems to me on surface inspection that slight boundary changes might cause closer ratios, I feel compelled to defer to the school board's expertise in this. If, however, ratios do not improve in the near future either from changing housing patterns, or majority-to-minority transfers, then boundary changes will be necessary.

## IV.

Aggressive affirmative action is required by the school board to insure minority faculty and staff in at least the same ratio as the minority bears to the population. This must be accomplished as soon as practicable. Also, the school board is required to assign minority teachers and staff so that their ratio in each school is substantially the same as their ratio bears to teachers and staff in the entire school system.

---

* Iles is a 5th and 6th grade center for the southwest quadrant; Lincoln is a 1st grade center for the northwest quadrant; Matheny is a 1st and 2nd grade center for the northeast quadrant; Webster is a 6th grade center for the southeast quadrant.

** Blackhawk, Harvard Park, Hay-Edwards, McClernand, Ridgely, and Wanless.

It is important that teachers and staff attend in-service training programs to equip them to handle the different composition of student enrollments and problems that may be anticipated. For that reason such training is ordered to be completed before the start of the 1977–78 school year.

## V.

During the period of transition it is important that problems which may arise be discovered early so that proper steps may be taken to correct them. Also, there should be some mechanism for parents to communicate their concerns about the working of the plan to the school board and to this Court. For that reason a citizens monitoring committee will be created to serve this and other needs. To the same end, the Community Relations Service of the United States Department of Justice will be appointed to bring the experiences of other communities with court-ordered integrated schools to Springfield so that we may profit from those experiences.

## VI.

Under the plan, elementary school children will in some grades be attending schools further from their homes than they do now. This may create problems for some parents if a child becomes ill during the day. For this reason, the school board should provide automobile transportation for those children if needed because of illness.

## VII.

Finally, much argument in this case has been devoted to the timing of integration. Plaintiffs forcefully argue that the plan should be implemented in January or February, 1977. They point to cases which support the proposition that school integration must be done "now" and not delayed. Attorneys for defendants just as forcefully argue that whatever plan is adopted it should not be implemented until the fall of 1977.

I have carefully considered the arguments on both sides of this question. In my opinion implementation of the plan for K–6 students should not begin until the fall of 1977. There are many reasons for this conclusion. It would be harmful to elementary children to have the school year disrupted by changing schools and teachers. The teachers and staff should receive in-service training to help them meet this challenge before the plan begins. The school board needs the extra time to plot all details which will be necessary to put this plan into effect. A Fall 1977 implementation will afford time to the parties to appeal and permit final adjudication by the Court of Appeals before the beginning of the plan. These are but a few of the many reasons. In short, it seems to me that implementation in January would be most unwise.

## CONCLUSION

In reaching a decision I have taken what, in my opinion, is the best from all the plans presented to me. It has been uppermost in my mind that the plan adopted must be as even-handed and fair to all as is possible. Success will depend on sincere efforts of the school board, teachers, parents and the entire community. I am painfully aware of the concerns of all parents for the education, safety and well-being of their children. If we all work together in good faith to make the plan succeed, not only will these concerns prove to be unfounded but we will have a better community as well.

## MEMORANDUM AND ORDER

On April 11, 1974, plaintiffs filed this cause as a class action charging defendants, and their predecessors with numerous deliberate actions all of which boiled down to creating, fostering, and maintaining racial and ethnic segregation in the Springfield, Illinois, public schools. The action arises under the First, Thirteenth, and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §§ 1981, 1982, 1983 and 1988. Jurisdiction is based on 28 U.S.C. §§ 1331, 1343(3) and 1343(4).

Springfield, Illinois, is a city of approximately 92,000 people. Springfield School District # 186 serves the City of Springfield plus several contiguous areas. There are currently over 19,000 students enrolled in District # 186, served by twenty-eight elementary schools utilizing a K–6 grade structure, six middle schools, employing two seventh grade centers and four eighth and ninth grade centers, and three high schools.

Springfield's minority community resides largely in the city's center and east side in an area of approximately 150 square blocks. Of the more than 19,000 students in District # 186, 17.2 percent represent minority groups, either Black, Oriental, Hispano or American Indian. These minority groups represent 18.7 percent of the elementary school students but minority enrollment at specific elementary attendance centers ranges from 0.6 percent at the Staley attendance center to 90.5 percent at the Lincoln attendance center.

Similarly, minority enrollment accounts for 16.4 percent of the middle school students and 15.1 percent of District # 186 high school students. At specific middle school centers, minority enrollment ranges from 11.6 percent at the Edison facility to 21.3 at Jefferson. In the three high schools the lowest percentage of minority enrollment is 7.6 percent at Lanphier while the highest minority enrollment percentages are at Springfield Southeast with 27.3 percent.

On December 27, 1974, seven months after this litigation was instituted, the parties agreed to a Consent Decree which was entered by this Court. In that Decree, defendants admitted that the schools were segregated as a result of past discrimination and that defendants were liable for that discrimination. Thus this litigation was moved into the remedy stage.

The Decree required defendants to submit to the Court an educationally sound, administratively efficient, and financially feasible plan for racial integration. Furthermore, any plan submitted was required to contain a majority-to-minority transfer provision, to use all available and practicable techniques of desegregation, and to provide that, as nearly as is practicable, no attendance center be racially identifiable when compared on either a system-wide basis or when compared with any other attendance center containing the same grades. The Decree also set forth other criteria in various areas which will be dealt with below as necessary.

In accordance with the Consent Decree, the defendants submitted a document entitled "Plan for Racial Integration" on April 28, 1975. That plan however was rejected by Judge Wood in an unpublished memorandum order filed on April 2, 1976, as the plan did not fulfill minimum constitutional requirements or comply with the provisions of the Consent Decree.

Defendants on June 4, 1976, filed a second plan entitled "An Overall Desegregation Plan for the Springfield Public Schools" [hereinafter referred to as defendants' plan]. Plaintiffs filed objections to defendants' plan and, on July 7, 1976, filed a plan of their own [hereinafter referred to as plaintiffs' first plan]. At a pretrial conference held on August 9, 1976, both parties agreed to defendants' middle school plan, and that part of defendants' plan was accordingly ordered to be implemented in the fall of 1976, and is currently in effect. Subsequently plaintiffs filed a second plan [hereinafter plaintiffs' alternative plan] which utilizes the same grade structure as defendants' plan. Hearings were held on all three plans beginning September 27, 1976.

Before discussing the plans presented a couple of preliminary matters require discussion. First, defendants have consistently asserted that the Court has no power to view plaintiffs' plans until it is established that defendants' plan is either unconstitutional or unacceptable as not conforming to the Consent Decree or the Memorandum Order entered by Judge Wood when he rejected defendants' initial plan.

It is true that Judge Wood placed the responsibility for the development of a

new plan entirely on the shoulders of the Board.[1] That is as it should be. The Board has at its call the information necessary, and the expertise required, for recognition of problems in such a project that would go unnoticed by others. However, the placing of primary responsibility for plan development should not and will not, deter the Court from hearing evidence on alternative plans and feasible options. "[T]he Court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Louisiana v. United States,* 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965). Further as the United States Supreme Court said in *Green v. School Board of New Kent County,*[2] concerning the duties of the school board and the district court:

> . . . The matter must be assessed in light of the circumstances present and the options available in each instance. It is incumbent on the school board to establish that its proposed plan promises meaningful and immediate progress toward disestablishing state-imposed segregation. It is incumbent upon the district court to weigh that claim in light of the facts at hand and in light of any alternatives which may be shown as feasible and more promising in their effectiveness. . .

In this case liability was established by the Consent Decree in late 1974. Defendants have already had one proposal for remedial measures rejected as inadequate. To accept defendants' position would not only deny this Court a tool with which to measure defendants' proposals but would risk the possibility of substantial further delays in the implementation of a constitutionally acceptable desegregation plan. The decisions of the United States Supreme Court, binding on this Court, make it completely clear that the time for delay is long past.[3]

■■■ With these principles and authorities before me, I cannot say that defendants' position seeking to postpone any consideration of alternative plans until defendants' plan is rejected, is persuasive. I have heard evidence on all plans and will weigh defendants' claim that its plan promises meaningful and immediate progress in light of the feasible alternatives presented. Additionally, should the alternatives prove superior, it is fully within the power of this Court to order their implementation. "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad . . . ." *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971).

The second preliminary matter requiring discussion is that of the proper use of percentages and ratios. Defendants assert that the proper standard for determining whether a school is racially identifiable is $\pm$ 15 percent from the average minority student enrollment for the district. Thus any school in the district having a minority enrollment of more than 2.2 percent and less than 32.2 percent would not be racially identifiable.

Plaintiffs, on the other hand, assert that a variance of $\pm$ 10 percent from the percentage of minority enrollment in the grades in question is the appropriate range of non-racially identifiable schools. Thus

1. "The full responsibility for the new plan lies heavily and entirely with the Board, not with consultants or others. The decisions to be made and the responsibility for those decisions are the Board's alone, subject to the approval of this Court." Judge Wood's Memorandum Order dated April 2, 1976 at 20. (Hereinafter cited as Memorandum Order.)

2. 391 U.S. 430, 439, 88 S.Ct. 1689, 1695, 20 L.Ed.2d 716 (1968).

3. Cf., *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Carter v. West Feliciana Parish School Board,* 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970); *Green v. School Board of New Kent County,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

under plaintiffs' standards, an attendance center having a minority enrollment of more than 8.7 percent but less than 28.7 percent at the elementary level would not be racially identifiable. Plaintiffs' range, of course, changes at the middle and high school levels because of the different percentages of minority enrollment at those levels.

While it is clear that there is no substantive constitutional right to a particular degree of racial balancing or mixing; *Swann, supra* at 24, 91 S.Ct. 1267; *Lawlor v. Board of Education of the City of Chicago,* 458 F.2d 660, 662 (7th Cir. 1972), the use of such ratios and percentages is a permissible starting point in the process of shaping a remedy. *Swann, supra* 402 U.S. at 25, 91 S.Ct. 1267; *Brewer v. School Board of the City of Norfolk, Virginia,* 456 F.2d 943, 945 (4th Cir. 1972), *cert. denied* 409 U.S. 892, 93 S.Ct. 109, 34 L.Ed.2d 149 (1972). Here, both of the proposed standards will be used as tools to fashion the appropriate remedy, but neither shall receive the Court's stamp of approval, or be regarded as absolute and unyielding to other factors. There is nothing magic about a set range of percentages which requires this Court to disregard all else.

## I.

The following is a short discussion and comparison of the three plans submitted for the Court's consideration, the various components of each, and the projected results to be achieved thereunder.

Defendants' plan at the elementary school level, which has been the major bone of contention throughout this litigation, contemplates the implementation of a "modified neighborhood school" concept, especially at the K–3 grade level. Essentially, the plan takes the twenty-eight current K–6 attendance centers and creates fifteen K–3 centers,[4] nine 4–6 centers,[5] and closes four existing facilities.[6]

At the K–3 level under defendants' plan, the district would be divided into fifteen attendance zones. Each zone would have contiguous boundaries, aiding in public comprehension and, apparently minimizing somewhat, the need to provide transportation for students. Under the latest enrollment projections, the K–3 centers would be expected to range from 2.6 percent minority enrollment at Addams, Blackhawk, and Southern View attendance centers to 32.9 percent minority enrollment at the Iles attendance center. Regardless of the standard applied to determine racially identifiable attendance centers, it is clear that some of the K–3 centers proposed are racially identifiable.[7]

At the 4–6 level under defendants' plan, nine attendance zones are created. The attendance zones at this level do not always have contiguous boundaries. There are created "islands" where students living within an area are transferred to an attendance center whose boundary is not contiguous with the area in which the student lives. These islands are utilized to achieve a higher degree of integration. Under the latest enrollment projections, minority enrollment in defendants' proposed 4–6 centers would range from 6.1 percent at Hazel Dell to 34.6 percent at Matheny. Again, regardless of the range applied, it is clear that some of

4. Proposed K–3 centers would include Addams, Blackhawk, Fairview, Hay-Edwards, Iles, Laketown, Lindsey, Marsh, McClernand, Pleasant Hill, Ridgely, Sandberg, Southern View, Webster and West Grand.

5. Proposed 4–6 centers would include Butler, Dubois, Enos, Harvard Park, Hazel Dell, Lawrence, Matheny, Wanless and Wilcox.

6. Lincoln, Withrow, Sandhill and Staley would be closed as attendance centers under defendants' plan.

7. Under defendants' range, there are no schools racially identifiable as white attendance centers and only Iles is a racially identifiable black school. While under plaintiffs' range Addams, Blackhawk, Fairview, Laketown, Lindsay, Sandberg and Southern View are racially identifiable as white attendance centers and Iles, Pleasant Hill, Ridgely, and West Grand are

defendants' proposed 4–6 centers are racially identifiable.[8]

Defendants' plan for the middle schools which has already been accepted and implemented, creates two seventh grade centers and four eighth and ninth grade centers. To create the attendance zones for the seventh grade centers, the district is simply divided in two parts by a north-south line. The west portion of the district is served by the Lawrence[9] attendance center and the east portion by the Washington attendance center. The enrollment in each of the two centers is comparable, and the racial balance achieved is acceptable,[10] under either plaintiffs' or defendants' test for racial identifiability.

The attendance zones for the four eighth and ninth grade centers[11] are created, to some extent, by dividing the attendance zones utilized for the seventh grade centers in two parts. There are, however, some significant variations from that north-south line in order to achieve a more equal student enrollment and a greater degree of racial integration. The enrollment figures in the four eighth and ninth grade centers range from 988 students at the Edison facility to 639 students[12] at the Jefferson building. The percentage of minority enrollment[13] at each attendance center is acceptable under either standard presented to determine racial identifiability.

The defendants' proposal for the three high schools in the district is to maintain the current attendance zones as they now exist, since the percentage of minority enrollment is assertedly within acceptable limits.[14] Essentially, the boundaries as currently constituted, send all the students from the Jefferson eighth and ninth grade center plus a number of students from the Franklin center to Springfield Southeast, while all the students from the Edison eighth and ninth grade center along with a number from the Grant center attend Lanphier. The remaining students attend Springfield High upon graduation from the Grant and Franklin eighth and ninth grade centers.[15]

Although defendants' plan contemplates no immediate boundary changes, provisions are made for voluntary transfers which aid in achieving racial balance. This, of course,

racially identifiable as black attendance centers.

8. Under defendants' range Matheny would be racially identifiable as a black attendance center. Plaintiffs' range would add Hazel Dell as a racially identifiable white attendance center.

9. Lawrence under the defendants' plan will be a 4–6 center beginning with the next school year and the Feitshans building is scheduled to replace it as a seventh grade center.

10. Lawrence has a minority enrollment of 16.4 percent and Washington has a minority enrollment of 16.5 percent. The district-wide average minority enrollment in the middle schools is 16.4 percent. See, defendants' exhibit 2–6.

11. The Edison, Franklin, Grant and Jefferson buildings are utilized as eighth and ninth grade centers.

12. Enrollment figures from defendants' exhibit 2–6 include:

| Edison | 988 students |
| Franklin | 755 students |
| Grant | 782 students |
| Jefferson | 639 students |

13. Percentage of minority enrollment at the eighth and ninth grade centers from defendants' exhibit 2–6 include:

| Edison | 11.6% minority |
| Franklin | 19.1% minority |
| Grant | 15.9% minority |
| Jefferson | 21.3% minority |

14. According to defendants' exhibit 2–6, Lanphier presently serves 1,629 students with a 7.6 percent minority enrollment, while Springfield High serves 1,528 students with a minority enrollment of 10.5 percent, and Springfield Southeast serves 1,583 students with a 27.3 percent minority enrollment. The district-wide average percentage of minority enrollment at the high school level is 15.1 percent.

15. Defendants' plan provides that where a student wishes to attend a high school outside his or her normal attendance center in order to remain with his or her ninth grade classmates a transfer will be allowed so long as its aids the desegregation process.

is the majority-to-minority transfer provision required by the Consent Decree. Further, the defendants propose an annual review of the minority percentages in each high school, resulting in boundary changes whenever necessary to bring the minority enrollment in each school within an acceptable range.

In the area of personnel, defendants' plan seeks, through affirmative action in hiring and active minority recruitment, to raise the percentage of minority staff members to a percentage equal to the percentage of the minority in the community. The goals set by defendants, seek to accomplish this for faculty at the primary level within three years, at the 4–6 level within five years, and at the middle and high schools levels within seven years. No immediate changes are contemplated.

Essentially, plaintiffs' plan divides the district into quadrants and thereafter utilizes a "cluster" technique to achieve acceptable levels of racial integration. "Pairing" of schools is also used in one instance.[16] More specifically, in each quadrant those schools currently with acceptable minority percentages remain as K–6 centers with only slight modifications of their boundaries being advocated.[17] There are six such schools [18] under plaintiffs' plan.

Plaintiffs' "clustering" concept creates in effect one large attendance zone in each quadrant. Each zone contains one attendance center where the current minority enrollment is above fifty percent.[19] That attendance center is then under plaintiffs' plan, denominated as a one or two grade center [20] and clustered with the outlying predominately white schools in the quadrant. Thus, for example, in the northwest quadrant, the Hay-Edwards and McClernand [21] attendance centers would remain as K–6 centers, and Addams, Lincoln, Dubois and Enos are clustered. Lincoln would serve as the first grade center for the cluster and all first graders would attend Lincoln. The students who would normally attend grades two through six at the Lincoln facility would attend either Addams, Dubois or Enos.[22] Kindergarten students are excluded under plaintiffs' plan and would continue at their current attendance centers. Thus, the grade structure at Lincoln would be K–1 and the grade structure at Addams, Dubois and Enos would be K–2–6. Plaintiffs' plan would leave only one school which could be considered racially identifiable.[23] The remaining elementary schools would fall between 10.8 percent black at Addams attendance center, and 25.9 percent black at Lincoln attendance center, clearly not racially identifiable under either plaintiffs' or defendants' definitions.

Plaintiffs agreed that defendants' plan adequately desegregated the District # 186 middle schools and accordingly submitted no plan on that subject. They did however

16. Withrow and Pleasant Hill are paired. Pleasant Hill serving as a 1–3 center and Withrow as a 4–6 center.

17. Plaintiffs did not present actual boundaries leaving the drafting of such boundaries to the Board. Plaintiffs did however propose the number of students to be affected by such boundary changes. See plaintiffs' exhibit 2–2A at 3.

18. Blackhawk, Harvard Park, Hay-Edwards, McClernand, Ridgely and Wanless.

19. The four schools in question and the current percentage of minority students are Iles with 59.4 percent minority, Lincoln with 90.5 percent minority, Matheny with 55.9 percent minority and Webster with 52.8 percent minority enrollment. See defendants' exhibit 2–6.

20. Iles is proposed as a fifth and sixth grade center; Lincoln is proposed as a first grade center; Matheny as a first and second grade center; and Webster as a sixth grade center.

21. After the boundary adjustments proposed by plaintiffs Hay-Edwards would have a minority enrollment of 11.3% while McClernand would have a minority enrollment of 15.9%.

22. Plaintiffs' plan calls for 1/5 of Lincoln's students in grades 2–6 to go to Addams, 2/5's to Dubois, and 2/5's to Enos.

23. Iles at 29.9 percent minority enrollment would be racially identifiable under plaintiffs' standards but not under defendants' standards.

suggest that perhaps a "feeder pattern system"[24] should be considered for the entire district including the middle and high schools. Further, concerning the high schools, plaintiffs advocate "minor boundary revisions" prior to the acceptance of the defendants' plan in order to improve the racial balance at Springfield Southeast[25] which plaintiffs assert, is currently racially identifiable under plaintiffs' proposed standard.[26]

Plaintiffs assert that nineteen of twenty-eight black professionals at the elementary level are assigned to racially identifiable black schools. Further, twelve of the thirty-two black classified personnel are assigned to racially identifiable black elementary schools. Plaintiffs contend that these concentrations contribute to the racial identifiability of the schools and should not be allowed to continue. Black teachers, plaintiffs advocate, should be reassigned so that no more than two black teachers remain at any one school.[27] The basis of such reassignment should be seniority if it cannot be accomplished voluntarily. Regarding affirmative action plaintiffs assert that the proper goal is not a number of black professional and certified staff equal to the percentage of minority population within the district, but rather that the elementary, middle and high school levels should each have a number of black professional and staff personnel equal to the percentage of minority enrollment in the school level under consideration.

Plaintiffs' alternative plan presents an additional elementary school plan and incorporates the other elements of plaintiffs' original plan by reference. This plan utilizes, as does defendants' plan, the creation of K–3 and 4–6 centers. All of the present twenty-seven elementary schools with a single exception[28] are used as either K–3[29] or 4–6 centers.[30] Essentially, plaintiffs again employ quadrant[31] and cluster concepts. In each quadrant, with one exception, two of the present elementary facilities are proposed as 4–6 centers.[32] The remaining elementary facilities in each quadrant are proposed as K–3 centers.[33] Within each qua-

24. Such a system is predicated on integrated elementary schools whose enrollments are concentrated into a smaller number of middle schools which in turn are concentrated into a still smaller number of high schools. At least theoretically under this type of plan, there would be no problem with racial identifiability of either middle or high schools since their enrollments would be taken en toto from racially balanced elementary schools. This type of plan would allow most students to remain together throughout the twelve years of public education.

25. Springfield Southeast has a 27.3 percent minority enrollment.

26. Plaintiffs' standard for determining racial identifiability is ± 10% from the average minority percentage in the level in question. The average minority percentage for the high school level is 15.1%. Thus, plaintiffs' range of non-racially identifiable schools at the high school level is from 5.1% to 25.1% minority enrollment.

27. This standard would require the transfer of ten black teachers, three from Lincoln, six from Iles and one from Matheny.

28. Sandhill School is closed under plaintiffs' alternative plan as well as all other plans submitted.

29. Plaintiffs' alternative plan proposes seventeen K–3 centers.

30. Plaintiffs' alternative plan proposes nine 4–6 centers.

31. Withrow students however would be transferred to some extent outside their quadrant to achieve a greater degree of racial balance.

32. The northwest quadrant plan proposes three 4–6 centers, Matheny, Wanless and Wilcox. The proposed 4–6 centers in each of the remaining quadrants are:

Northwest – Dubois and Enos
Southeast – Hazel Dell and Harvard Park
Southwest – Butler and Iles

33. Quadrants and the K–3 centers therein include:

Northwest – Addams, Hay-Edwards, Lincoln and McClernand

drant the present attendance zones are divided and students reassigned so as to establish K–3 centers with an appropriate racial mix.[34] Although the plan as presented is not completely fleshed out,[35] it is clear that a number of non-contiguous attendance zones are created for certain of the K–3 centers.

For example, Withrow[36] School, on the east side of the district, would be established as a K–3 center under plaintiffs' alternative plan. Withrow's current enrollment at the K–3 level would be divided into four equal parts. One part would remain at Withrow, one part would attend Sandberg K–3 center on the southwest side of the district, one part would attend Southern View attendance center on the south, and, on the other one part would attend Laketown on the south. At these receiving schools, Sandberg would send one half of its present K–3 enrollment to Withrow, while the one one half would remain at Sandberg. The students currently attending Laketown and Southern View at the K–3 level would remain there under this plan. Thus it is clear that the Sandberg, Withrow, Laketown and Southern View attendance centers would employ a number of non-contiguous attendance zones. This same observation can be made for other attendance zones under this plan.

In summary each plan has positive and negative aspects. Defendants' plan with its contiguous boundaries at the K–3 level, and

Northeast – Fairview, Pleasant Hill and Ridgely

Southeast – Laketown, Southern View, Staley, Webster and Withrow

Southwest – Blackhawk, Lindsay, Marsh, Sandberg, West Grand and Withrow.

small number of non-contiguous attendance zones at the 4–6 level, is less complicated, and thus, through comparative ease of explanation, might, if implemented, aid in community acceptance. Transportation is somewhat minimized at the K–3 level and the majority of K–3 students will be able to attend a 4–6 center with their classmates. On the other hand, defendants' plan is not as successful as either of plaintiffs' plans in achieving racial integration. There is clearly a disparity between attendance centers in the percentage of minority enrollment achieved.[37] Depending upon the standard employed to determine racial identifiability, as few as one or as many as eleven of the fifteen K–3 centers can be considered racially identifiable. Of the nine attendance centers proposed for the 4–6 level, one or two would be considered racially identifiable depending upon whether defendants' or plaintiffs' standards for determining racial identifiability are utilized.

The other major drawback to defendants' proposed plan is the closing of four existing facilities and reassigning the students from those attendance areas as a tool of racial integration. One of these schools, Sandhill, has a small enrollment,[38] and it has been shown, at least to plaintiffs' satisfaction, that it should be closed since the school is closed under all the plans presented to the Court. Of the other three schools to be closed under defendants' plan, two are currently racially identifiable as black[39] while

34. Plaintiffs' proposed K–3 centers range in enrollment from 23.9% minority at Webster to 11.9% minority at Laketown. The proposed 4–6 centers range in minority enrollment from 12.1% minority at Wilcox to 17.7% minority at Dubois. No attendance center under this plan is racially identifiable under either of the proposed standards.

35. As with plaintiffs' first plan, the actual drawing of the new attendance zone boundaries is left to the defendants.

36. Withrow is currently a racially identifiable K–6 center with a minority enrollment of 67.3 percent.

37. Proposed minority enrollment at the K–3 level ranges from 2.6% to 32.9%. At the 4–6 level defendants' proposed minority enrollment ranges from 6.1% to 34.6%.

38. Sandhill has an enrollment of 155 caucasians and 2 blacks. Defendants' exhibit 2–6.

39. Lincoln has a minority enrollment of 305 students out of a 337 total enrollment. While at Withrow 200 of the 297 students enrolled are black.

a third is a racially identifiable white school.[40]

Moving then to plaintiffs' plans. Both plans effectively desegregate the district schools at all levels. Further both plans maintain the three schools that defendants contemplate closing as active attendance centers.

Plaintiffs' first plan has two distinct advantages over either of the other plans submitted. First, the plan maintains those attendance centers currently possessing an appropriate racial balance without significant change. This allows those schools to retain their K–6 grade structures and keeps disruption of the schools and students to a minimum.

Secondly, plaintiffs' first plan does not affect kindergarten. Thus, kindergarten classes will be maintained at each of the twenty-eight current attendance centers with the exception of Sandhill. This, of course, allows the youngest children in the Springfield public schools to remain as close to home as the current system now allows.

The disadvantages of plaintiffs' first plan appear to be only relative. First, although the evidence and testimony at the hearings is far from conclusive, it would appear that slightly more students will require transportation under plaintiffs' first plan than under defendants' plan. It should be noted, however, that at least the amicus curiae believe that any of the proposed plans would result in a reduction in the numbers of students to be transported from the current transportation requirements of the district. See, *Reply Brief of Amici Curiae*, Illinois Office of Education at 1. It is unclear whether plaintiffs' first plan or plaintiffs' alternative plan would require more transportation.

The other relative disadvantage is the creation of non-contiguous attendance zones

within the current boundaries of the four racially identifiable black schools which are proposed as one or two grade centers. All the plans presented, however, utilize non-contiguous attendance zones to some extent. Plaintiffs' first plan utilizes such zones to a greater degree than does defendants' plan but to a lesser degree than plaintiffs' alternative plan.

Plaintiffs' alternative plan also has advantages and disadvantages. The first and most obvious advantage is that there is no disagreement with defendants' plan as to the grade structure utilized. Both plaintiffs' alternative plan and defendants' plan utilize a K–3 and 4–6 grade center structure. Kindergarten students are likewise covered under both plans. Plaintiffs' alternative plan, however, maintains three schools as attendance centers that defendants' plan would close.[41] Further, plaintiffs' alternative plan achieves a greater degree of desegregation than does defendants' plan since regardless of the standard applied, *no school under plaintiffs' alternative plan can be considered racially identifiable.*

The major disadvantage to plaintiffs' alternative plan is its apparent complexity and the number of non-contiguous attendance zones that are created. A number of current attendance zones are divided into fractions at the K–3 level.[42] Further at the end of the K–3 experience, students are returned on paper to the currently existing attendance zones and redivided and reassigned to a 4–6 center without regard to the K–3 center they attended. It would appear that this process is of sufficient complexity to have some negative impact on community understanding and hence acceptance and, furthermore, it would result in more students being separated from their classmates more than necessary as they move between the K–3 and 4–6 grade levels.

---

**40.** Staley has a current enrollment of 173 caucasians and 1 black for a minority enrollment percentage of 0.6%.

**41.** Lincoln, Withrow and Staley.

**42.** E.g. Withrow into quarters, Butler into thirds, Lincoln into thirds, Iles into thirds.

## II.

Having described and compared the plans upon which the Court has heard evidence, it is clear that none is acceptable *en toto.* Each plan has parts that are clearly superior to equivalent parts of the other proposed plans. Under the circumstances a combination of the plans presented, in my opinion, will be the most equitable and effective solution and clearly in the best interests of the children of District # 186.

Such an amalgamation of the three plans presented is fully within the equitable powers of this Court. "In default by the school authorities of their obligations to proffer acceptable remedies, a district court has broad power to fashion a remedy . . ." *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). Whether a proffered remedy is acceptable must be determined ". . . in light of the facts at hand and in light of any alternatives which may be shown as feasible and more promising in their effectiveness." *Green v. County School Board,* 391 U.S. 430, 439, 88 S.Ct. 1689, 1695, 20 L.Ed.2d 716 (1968). Further, "[t]he measure of any desegregation plan is its effectiveness." *Davis v. School Comm'rs of Mobil County,* 402 U.S. 33, 37, 91 S.Ct. 1289, 1290, 28 L.Ed.2d 577 (1971). Here, I cannot say that defendants have proffered an acceptable remedy. Thus the broad equitable power of this Court to fashion an appropriate remedy is invoked.

Although the Court has absolutely no doubt as to the good faith of the defendants, the plan submitted at the K–3 level is unacceptable as compared to plaintiffs' plans in at least two respects. First the plan is not one which would assign students ". . . in such a way that, as nearly as practicable, each attendance center serving particular grade levels have the same racial and ethnic composition . . ." *Consent Decree* at 7. While it is true that the ". . . constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole," *Swann, supra* 402 U.S. at 24, 91 S.Ct. at 1280, the disparities in the minority enrollment figures between attendance centers under defendants' plan is so large as to be inequitable. Under defendants' plan, with very few exceptions at the K–3 level, an attendance center would have either a minority enrollment of less than 6 percent or a minority enrollment of more than 25 percent. In fact, the racial balance at some attendance centers would be less acceptable under defendants' plan than as they currently stand.

Secondly, defendants' plan contemplates the closing of two racially identifiable black schools as an integral part of their desegregation efforts. While school closings are not an impermissible tool of desegregation, *United States v. Board of Education of Baldwin County, Georgia,* 423 F.2d 1013 (5th Cir. 1970), "proposals to close black schools which coincide with implementation of constitutionally required desegregation place the burden on school authorities to demonstrate that racial considerations did not result in the decision to cease operation of these facilities." *Monroe v. Board of Com'rs of City of Jackson, Tenn.,* 505 F.2d 105, 108 (6th Cir. 1974), *citing Robinson v. Shelby County Board of Education,* 467 F.2d 1187, 1200 (6th Cir. 1972). (McCree, J., concurring in part and dissenting in part) and *Haney v. Sevier County Board of Education,* 429 F.2d 364 (8th Cir. 1970). Here, defendants' evidence was insufficient to establish a non-racial purpose for the proposed school closings.

In contrast, plaintiffs' first plan, utilizing the quadrant and cluster approaches, is clearly superior and will be adopted. The problems found under defendants' plan are then not present. The disparities in the minority enrollment figures between the different attendance centers are not so large as to be inequitable. All areas of the district are equally involved in the desegregation effort. Further no racially identifiable black schools are closed in the process.

■ Additionally, plaintiffs' first plan has a number of advantages not found in either defendants' plan or in plaintiffs' alternative plan. It allows a number of schools that currently have, or whose boundaries can be slightly altered to create, a minority enrollment figure substantially equivalent to that of the minority enrollment figures of the schools in the various clusters, to retain the present K–6 grade structure. In this regard, at least one court has held, and I cannot help but agree, that "elementary students who already attend integrated schools in their own neighborhoods should not be disturbed for other than compelling circumstances." *Clark v. Board of Education of Little Rock School District*, 449 F.2d 493, 499 (8th Cir. 1971), *cert. denied* 405 U.S. 936, 92 S.Ct. 954, 30 L.Ed.2d 812 (1972).

A second advantage of plaintiffs' first plan over all other plans submitted is the provision for kindergarten students. In allowing kindergarten students to remain at their current attendance centers, it takes into account the "physical and psychological health" of the children and maintains the "neighborhood school concept" where its rationale is strongest.

One of the major objections to the adoption of plaintiffs' elementary plan or any elementary plan for that matter, can be seen through letters which have been made part of this record, received by the Court from concerned citizens. That objection is that the elementary children are at least perceived to be further from home than under the current system. This can cause a number of problems should the child become ill and need to be sent home before the scheduled end of class. Parents, for lack of transportation or other reasons, may be unable to reach their children in time of distress. This concern can be to some extent alleviated by requiring the district to establish provisions in each school so that automobile transportation is available to take any child home during any portion of the school day when such transportation is required and unavailable to the parents of the child in distress. It shall be so ordered.

■ The defendants' middle school plan as currently in effect, is adopted and shall be continued. The defendants' plan at this level has none of the problems found in defendants' elementary school proposal. There is achieved an acceptable level of integration; there are no closings of racially identifiable schools and public acceptance has already been proven through the experiences of the 1976–77 school year. The plan at this level is equitable, simple, and functioning. It will be continued.

■ Defendants' plan for the high schools although marginal will be accepted and adopted. The gains to be had by the plaintiffs' proposed immediate boundary changes, do not justify the disruption of the educational pursuits and social attachments of those students who would be required to change schools. Here, the minority enrollment in each of the high schools is not so disproportionate as to require immediate change. The schools are unitary and desegregated as they currently exist.

However, any increase in the minority enrollment at Springfield Southeast or any decrease in the minority enrollment at Lanphier or Springfield High may well require one or all of those schools being labeled as racially identifiable and justify the Court ordering changes in the attendance zone boundaries. As those schools currently stand in relationship to one another, however, none in the opinion of the Court can be found to be racially identifiable. The defendants' plan which calls for institution of a majority-to-minority transfer provision and a yearly re-examination of the changes whenever the current relationship deteriorates is a sufficient response to the present situation.

■ In the area of affirmative action, the proper goal for defendants to pursue is that of a faculty and staff properly representing all segments of the community. The evidence presented clearly shows that at least on the level of certified staff the defendants are seriously pursuing this goal. However, I feel that certain procedures including the authority for recruiters to hire

minority candidates on the spot, or to make firm job offers to such qualified minority candidates as are interviewed would certainly increase the effectiveness of the defendants' efforts. In any event, the goal of increasing the minority presence within the ranks of the defendants' employees to a point equal to the minority representation in the community should be pursued relentlessly, and achieved as soon as practicable, taking into account the problems of decreasing student enrollment and the corresponding decrease in the defendants' personnel needs. The three, five and seven year goals for increasing minority representation for the different levels as proposed under defendants' plan are unacceptable and are expressly disapproved. The goal here is to be pursued with equal vigor at all grade levels and at all levels of professional competence.

As to employee assignment, plaintiffs propose, and the Court agrees, that the "Singleton Rule" should be implemented at the beginning of the Fall 1977 semester. That rule provides that the ratio of minority personnel to ". . . white teachers in each school, and the ratio of other staff in each, are substantially the same as each such ratio is to the teachers and other staff, respectively, in the entire school system." *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211, 1218 (5th Cir. 1970), *rev'd on other grounds sub nom. Carter v. West Feliciana Parish School Board*, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970). The necessary transfers of personnel shall be accomplished voluntarily if possible, but shall be accomplished by the beginning of the fall 1977 school term in any event. Such transfers will have the effect of eliminating one of the elements of the racially identifiable schools that is uniquely within the control of the school authorities and will provide all students with the opportunity to observe and interact with successful adult members of the minority community.

Implementation of the remainder of the desegregation plan shall be instituted beginning with the 1977–78 school year. The Court is fully aware of the cases cited by plaintiffs [43] and agrees that their language militates for a mid-year implementation. However, there are a number of factors which make a complete January implementation unwise. First, the plan adopted for the elementary schools is not the one proposed by defendants, thus any contingency plans prepared on the basis of defendants' own plans are inoperable. Additionally, time is required to prepare the facilities for conversion to the altered grade structures and to perform the task of boundary redrafting required under the elementary plan adopted. Further, the question of the utilization of the Lawrence facility is yet to be resolved.[44] Finally, it is the opinion of the Court that more time than one month is required for the training of defendants' employees and for the laying of the ground work necessary for a smooth transition.

On these latter subjects, it shall be required that all defendants' employees shall participate in an in-service training program that will equip them to handle the different composition of their student enrollment and the problems that may be expected. This training should place heavy emphasis on the problems of discipline and seek to assure that the same disciplinary standards are applied to all students.

Further, in the areas of transition and community preparation the Court on its own motion will order the establishment of a biracial citizens' advisory and monitoring commission. Such citizen participation groups have been established in many similar cases, e.g. *Singleton v. Jackson Municipal School District,* 426 F.2d 1364 (5th Cir.

---

43. *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 6, 14, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Green v. County School Board*, 391 U.S. 430, 439, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

44. Plaintiffs' plan makes no provision for utilizing Lawrence School which defendants proposed as part of their elementary school plan for 1977. The defendants shall seek to utilize this facility in a manner consistent with the essentials of the plan here adopted.

1970); *Keyes v. School Dist. No. 1, Denver, Colo.*, 380 F.Supp. 673 (D.C.Colo.1974); *Morgan v. Kerrigan*, 401 F.Supp. 216 (D.C. Mass.1975) and have been found a useful aid in the accomplishment of peaceful and constructive desegregation. This litigation itself, has a history of useful citizen participation as seen through the current Implementation Forum and the earlier Intercultural Affairs Planning Council.

In general, the functions of the committee shall include the co-ordination of the efforts of interested community agencies and individuals, community education, receipt of comments, criticisms and suggestions from the community, monitoring the progress of the implementation of the plan herein set forth, working with the defendants to resolve problems occurring in such implementation and reporting to the Court as to the nature and resolution of problems encountered. A more detailed exposition of the duties of the citizens committee will be forthcoming along with the Court appointment of citizens to serve on the committee.

■ In order to aid the Court in establishing the citizens committee and in order to provide organizational and technical assistance to the committee itself, the Court hereby appoints the Community Relations Service of the United States Department of Justice in accordance with 42 U.S.C. § 2000g. In addition the Service will be directed to perform specific community relations and related projects which this Court from time to time may deem necessary to the implementation of the desegregation plan, and to inform the Court, on a continuing basis, as to all matters which bear upon the speedy and harmonious implementation of the desegregation plan.

■■ In order to assist such Service in the carrying out of its functions on behalf of the Court, all parties to the litigation are directed to cooperate with the Service and to afford the Service reasonable access to their records and personnel, and furnish to the Service at 55 East Monroe Street, Chicago, Illinois 60603, copies of all papers hereafter filed in these proceedings, and that the Service shall in return furnish to

counsel for the parties copies of any written reports submitted to the Court.

IT IS HEREBY ORDERED THAT:

1. Plaintiffs' first plan for the K–6 level be adopted and implemented beginning with the Fall 1977 school year;

2. Defendants' plan for the middle school level be adopted and continued;

3. Defendants' plan at the high school level be adopted and continued incorporating defendants' plan for yearly re-examination and boundary changes as necessary;

4. Defendants shall, at the K–6 level, provide automobile transportation at each school for those students who through injury or illness are required to return home during the school day;

5. Defendants shall institute faculty transfers by the Fall 1977 school year so that the minority faculty representation in each attendance center reflects the district-wide minority faculty representation;

6. Defendants shall institute staff transfers by the Fall 1977 school year so that the minority staff representation in each attendance center reflects the district-wide minority staff representation;

7. Defendants shall insure that all employees participate in an appropriate in-service training program prior to the beginning of the Fall 1977 school year;

8. Defendants shall utilize the Lawrence facility in a manner that conforms to the elements of the plan herein adopted;

9. The Community Relations Service of the United States Department of Justice shall aid this Court in the establishment of a citizens monitoring committee and such other tasks aiding in the implementation process, as the Court may assign.